UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**DEREK PELLE**,                                    Case No. 1:12 CV 2850

       Plaintiff,                              Magistrate Judge James R. Knepp II

   v.                                              MEMORANDUM OPINION AND
                                                ORDER

**COMMISSIONER OF SOCIAL SECURITY**,

       Defendant.

## INTRODUCTION

Plaintiff Derek Pelle seeks judicial review of the Commissioner's denial of supplemental security income (SSI) benefits under 42 U.S.C. § 1383. The district court has jurisdiction over this case under 42 U.S.C. § 1383(c)(3). The parties have consented to the exercise of jurisdiction by the undersigned in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 13). For the reasons given below, the Court remands the Commissioner's decision denying benefits for further development under the treating physician rule.

## PROCEDURAL BACKGROUND

On April 29, 2009, Plaintiff's mother filed an application for SSI on his behalf, alleging a disability onset date of January 1, 2006, due to bipolar disorder and social anxiety. (Tr. 126, 203). His application was denied initially and on reconsideration. (Tr. 67-71). Plaintiff then requested a hearing before an Administrative Law Judge (ALJ). (Tr. 125). Plaintiff, represented by counsel, a vocational expert (VE), and Plaintiff's mother testified at the hearing, after which the ALJ found Plaintiff not disabled. (*See* Tr. 10-32, 38-66). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the

1

Commissioner. (Tr. 1-3); 20 C.F.R. §§ 416.1455, 416.1481. On November 15, 2012, Plaintiff filed the instant case. (Doc. 1).

FACTUAL BACKGROUND

Born March 21, 1992, Plaintiff was seventeen years old when his application for SSI was filed. (Tr. 126). As such, he was considered a child for social security disability purposes until he turned eighteen on March 21, 2010. (Tr. 20). 20 C.F.R. §§ 416.926a(g)(2), (i)(2), (k)(2). Accordingly, the ALJ analyzed Plaintiff's claim according to the regulations as both a child and an adult. (Tr. 13-32).

The ALJ's discussion of Plaintiff's mental impairments, medical history, hearing testimony, and education is an accurate and thorough reflection of the record and fully incorporated herein. (Tr. 18-22).

> The medical evidence reveals that the claimant was first treated for problems of stealing and anger management in 2005 (Exhibit 5F). He began therapy in May 2005, but discontinued treatment in August 2005. He was hospitalized in May 2006 for depression and anger issues resulting in self-cutting (Exhibit 5F). He was prescribed Lexapro and reported a better outlook, better sleep, and improvement in his depression. The claimant engaged in regular psychotherapy sessions and psychiatric treatment. In August 2006, the claimant reported doing overall better with increased emotional stability; however, he further reported occasional incidents of defiant behavior and irritability. His Lexapro dose was increased to 15 mg. Despite his continuing symptoms, he was given a GAF score of 70, indicating his symptoms were at most mild. In November 2006, the claimant ran away with his girlfriend for two weeks (Exhibit 7F). On his return, he was found to suffer only mild symptoms related to his depressive disorder, anxiety disorder, learning disorder, and oppositional defiant disorder.

> Throughout 2007, the claimant's symptoms continued to stabilize with use of prescription medication (Exhibit 7F). Then, on February 18, 2008, the claimant was hospitalized for suicidal ideation (Exhibit 3F). He initially complained of chest pains, but on examination by the attending physician, the claimant admitted that he had taken heroin because he was depressed. He reported threatening his mother with a knife, though he stated he did not actually want to hurt her. The police were called and the claimant was admitted to Laurelwood Counseling Center from February 19, 2008 to February 22, 2008 (Exhibit 1F). At Laurelwood, the claimant complained of mood swings, periods of decreased

2

sleep, and increased energy, despite use of prescription Depakote and Lexapro. He was diagnosed with bipolar disorder. During treatment the claimant was taken off Lexapro and placed on Abilify in combination with Depakote. He "did extremely well with this medication" and his mood began to stabilize. He was discharged with a GAF score of 59 and placed in Juvenile Detention. In April 2008, his condition was stable and he exhibited at most moderate symptoms related to his mental impairments (Exhibit7F).

On May 22, 2008, the claimant was brought to the emergency room after reportedly ingesting 14 ibuprofen (Exhibit 3F). At the emergency room the claimant admitted that he had not taken any ibuprofen, he just wanted an excuse to get out of school. In June 2008 the claimant was started on Geodon but by October 2008, he was back to using Abilify, which he reported was "working well." (Exhibit 7F). The claimant was treated by Dr. Witham on March 18, 2009, for major depressive disorder, oppositional defiant disorder, anxiety disorder, and learning disorder (Exhibit 4F). He was taking Depakote and Abilify and reported medication adherence. Both the claimant and his mother reported "much improvement" in the claimant's condition since beginning home schooling. The claimant was calmer, more pleasant, and was "doing what's asked of him." The claimant reported some improvement in anxiety and panic symptoms since starting Abilify and increased level of functioning with Depakote. He was given a GAF score of 60 for moderate symptoms.

In October 2009, the claimant's mother reported the claimant was "doing better than ever before." (Exhibit 10F). In January 2010, the claimant reported having a new girlfriend and continuing to look for a job (Exhibit 13F). He reported doing well and continuing with his high school classes to obtain a diploma. He expressed a desire to attend school during his senior year if his anxiety would allow it, but in the meantime he continued with homeschooling. The claimant was diagnosed with mood disorder, but was no longer diagnosed with anxiety disorder, learning disorder, or oppositional defiant disorder. In the subsequent months the claimant reported multiple short term relationships, looking for jobs a "little bit," and overall experiencing no additional stressors. In September 2010, the claimant reported going to school, being involved with a new girlfriend, taking his medications regularly, and being respectful at home. He was diagnosed with mood disorder and social phobia, but he exhibited only moderate symptoms. On March 1, 2011, the claimant reported "doing well in all spheres" and adhering to treatment.

Education records reveal the claimant underwent a Wechsler Intelligence Scale for Children (WISC) in December 2000, at age 8. He achieved a verbal IQ score of 74, a performance IQ of 90, and a full scale IQ of 80, indicating low average intelligence (Exhibit lE). A Wechsler Abbreviated Scale of Intelligence (WASI) test was performed in 2004 and revealed a verbal IQ score of 76, a performance IQ score of 82 and a full-scale IQ score of 76. Results of the Kaufmann Brief Intelligence Test 2, dated January 18, 2007, revealed a slightly lower full-scale IQ

score of 75, but an increased verbal IQ of 84. The claimant was cooperative with testing and his overall intelligence was estimated to be in the borderline range.

The claimant began receiving special education services in second grade after struggling in both kindergarten and first grade (Exhibit lE). An Individual Education Program (IEP) was developed in 2004 and the claimant received general education instruction with special education support and accommodations. He was described as "well-behaved and hardworking, attentive and organized." He was noted to have frequent absences and tardies. The claimant's school transcripts revealed average grades, mostly Bs and Cs during the 2005-2006 and 2006-2007 school years (Exhibit 2E). The claimant's art teacher, Ms. Szemplak, described the claimant's class work as average or above average. He was "always respectful and polite," was able to follow directions, seemed to get along well with others, and had "lots of friends in his class." The claimant's computer teacher, Ms. Poole, noted that the claimant's work was inconsistent and that he needed to make up missing work; however, she noted that the claimant could at times do quality work, that he liked his classmates, and was polite, helpful and quiet. The claimant's written expression teacher, Ms. Robbins, described the claimant as compliant and polite. The claimant's work was completed with a "great deal of accuracy" but his absences had "significantly interfered with his ability to achieve adequate progress." He exhibited good critical thinking skills.

The school psychologist, Stefania Bafaro, submitted a report dated January 18, 2007 (Exhibit 2E). She noted that the claimant reported somatic symptoms of depression including stomachaches and headaches. The claimant's mother repotted aggression and rule breaking behavior including stealing, swearing, and destroying property at home. The claimant's special education teacher reported the claimant, though naturally quiet, was "[] much more so" than during the previous school year. She reported the claimant rarely smiled, appeared lethargic, and didn't "try." She opined that the claimant's symptoms were due to depression and anxiety. The claimant was diagnosed with a specific learning disability. Despite showing progress in all academic areas, the claimant was once again approved for special education services.

During the 2007-2008 school year the claimant's grades dropped to mostly Fs and some Ds (Exhibit 2E). By the 2008-2009 school year the claimant's grades had improved to mostly Cs and he continued to show academic improvement during his subsequent years of homeschooling.

An IEP dated May 6, 2009, noted that the claimant was switched to homebound instruction near the beginning of his freshman year due to "showing little or no progress in the classroom setting." (Exhibit 2E). He was often absent from school and his "absences have affected his grades." He was noted to be doing "much better with one on one instruction." His performance indicated average to above

4

average scores in his home school classes. He was scheduled to continue homebound instruction during the first semester of the 2009-2010 school year.

The claimant was reevaluated for special education services on January 20, 2010 (Exhibit 17E). Due to "significant skills deficits in Math Calculation, Math Reasoning, and Written Expression" the claimant was continued in special education services. His grade 10 report card revealed the claimant had achieved Cs in all of his courses.

At hearing, the claimant testified that he lives with his mother, sister, and father, and that he gets along with his family just fine. He testified that he is continuing to take high school courses through homebound education. He explained that he works with a tutor that comes to his house. He testified that he is unable to attend classes at school because of anxiety and panic attacks that cause stomachaches, headaches, and sweating. The claimant testified that he received special education services while in school, which mainly consisted of extra help from teachers in the classroom. He testified that his grades were very poor while he was attending middle school and high school but that he now gets Bs and Cs. The claimant testified that he occasionally has difficulty understanding his tutors, but that he is able to pay attention and listen to his tutors so he can get his education. The claimant testified that he has failed the Ohio Graduation Test twice and took it again in October 2010 but does not know his test results.

The claimant testified that he takes Depakote and Abilify and that they help his depression and bipolar symptoms. He stated that he believes he would further benefit from talking to someone such as a therapist or counselor.

The claimant testified that he attempted to work at Giant Eagle and at Sonic Drive-in but shortly after starting those job he began experiencing anxiety symptoms. He explained that there were too many people around and that he needs to be in a small little group or he panics. He stated that he experiences social phobia every time he works, which causes acid build up in his stomach, nausea, and really bad headaches.

The claimant's mother, Antoinette Pelle, also testified at hearing. She testified that the claimant is homeschooled due to his severe anxiety and social phobia. She explained that when he was attending school she would get a call within 30 or 40 minutes because the claimant was complaining of severe headaches, stomachaches, nausea, and vomiting. She testified that the claimant began homeschooling while in 10th grade. She stated that he tried to go back to school the beginning of 12th grade but ended up walking out due to anxiety symptoms. She testified that the one on one tutoring he receives now has been beneficial for the claimant's learning disability.

Ms. Pelle testified that the claimant struggles to hold a job because he doesn't like being around people. She explained that he likes to work on the computer and on

cars and that he can be around one or two people without suffering anxiety symptoms. She testified that the claimant has trouble taking instruction from authority figures. Ms. Pelle testified that the claimant has a variety of friends, mostly female, as well as a steady stream of girlfriends. She explained that the claimant appears to have no problem getting a girlfriend but his relationships do not last long. She stated that she felt the claimant lacked social skills and needed to see a counselor or therapist in addition to a psychiatrist.

Ms. Pelle testified that the claimant's Depakote dose was recently increased to 1500 mg and that she does see improvement with his medications; however, she stated that the claimant needed constant reminders to take his medications and even with reminders occasionally forgets to take them. Ms. Pelle testified that the claimant's medications treat his bipolar and depression but that he is not on any medications to treat his anxiety problems. She testified that the claimant is not currently seeing a counselor or therapist. She opined that the claimant is unable to work due primarily to his social anxiety but also because of anger outbursts related to his bipolar disorder. Dr. Lloyd Yeh offered a report dated June 2, 2009 (Exhibit 6F). He reported first treating the claimant "prior to 2004" and noted diagnoses of bipolar disorder, anxiety disorder, and learning disability. He opined that the claimant was "doing well" on Depakote and Abilify, though he opined that the claimant was unable to attend school. He stated that there were no compliance issues that would interfere with the claimant's treatment.

The claimant's treating psychiatrist, Terence Witham, submitted a report dated August 13, 2009 (Exhibit 9F). He reported treating the claimant for a single episode of moderate major depressive disorder, oppositional defiant disorder, anxiety disorder, and learning disorder. He stated that the claimant's "current academic placement, home based instruction, has brought a level of academic success that he has not shown for years previously." He further opined that the claimant's "emotional state has clearly benefitted from this placement with a marked reduction in both the number and intensity of symptoms of depression and anxiety being noted by his mother, myself, and [the claimant]." Dr. Witham submitted a second report dated August 24, 2009, opining that the claimant would be unable to attend school even with accommodation (Exhibit 8E).

(Tr. 18-22).

## ALJ Decision

The ALJ found Plaintiff had less than a marked limitation in his ability to acquire and use information. (Tr. 23). In so finding, the ALJ took into account Dr. Witham's and the state agency physician opinions. (Tr. 23). Despite low-to-average intelligence testing, the ALJ noted Plaintiff's grades improved throughout the years and even more so when he began home school

6

instruction. (Tr. 23). The ALJ also noted Plaintiff had failed the Ohio graduation examination multiple times, but questioned why he was taking a graduation test when he had not yet completed twelfth grade. (Tr. 23). The ALJ also noted Plaintiff's mental impairments improved with prescription medication, and Dr. Witham recognized Plaintiff school performance improved dramatically with home based education. (Tr. 23).

With respect to interacting and relating with others, the ALJ found Plaintiff had less than a marked impairment. In so finding, the ALJ took into account state agency physician opinions. (Tr. 25). The ALJ also questioned Plaintiff's credibility about his work capability. (Tr. 25). For instance, Plaintiff testified he quit his jobs and could not attend school because of panic attacks. (Tr. 25). However, Plaintiff told Dr. Witham he quit his job at Sonic because "all he did" was "direct traffic" and when he requested an inside job he did not get it. (Tr. 25). Moreover, despite reports of extreme social anxiety, the ALJ noted Plaintiff's teachers reported he had lots of friends and liked his classmates. (Tr. 25). Despite his mother's testimony that he had trouble maintaining relationships, the ALJ noted Plaintiff spent time with friends and girlfriends, and had no problem getting girlfriends. (Tr. 25).

Concerning the domain of caring for oneself, the ALJ found Plaintiff had less than a marked limitation despite state agency opinions to the contrary. (Tr. 27). The state agency physicians found a marked impairment based on two emergency room visits, one in February 2008 for suicidal ideation and one in May 2008 for medication overdose. (Tr. 27). However, the ALJ discounted these visits as they were attributed to heroin use or trying to get out of school. (Tr. 27).

### STANDARD FOR DISABILITY

Eligibility for SSI is predicated on the existence of a disability. 42 U.S.C. § 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of

7

any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). In the case of a claimant under the age of 18, the Commissioner follows a three-step evaluation process – found at 20 C.F.R. § 416.924(a) – to determine if a claimant is disabled:

1. Is claimant engaged in a substantial gainful activity? If so, the claimant is not disabled regardless of their medical condition. If not, the analysis proceeds.

2. Does claimant have a medically determinable, severe impairment, or a combination of impairments that is severe? For an individual under the age of 18, an impairment is not severe if it is a slight abnormality or a combination of slight abnormalities which causes no more than minimal functional limitations. If there is no such impairment, the claimant is not disabled. If there is, the analysis proceeds.

3. Does the severe impairment meet, medically equal, or functionally equal the criteria of one of the listed impairments? If so, the claimant is disabled. If not, the claimant is not disabled.

To determine, under step three of the analysis, whether an impairment or combination of impairments functionally equals a listed impairment, the minor claimant's functioning is assessed in six different functional domains. 20 C.F.R. § 416.926a(b)(1). This approach, called the "whole child" approach, accounts for all the effects of a child's impairments singly and in combination. SSR 09-1P, 2009 WL 396031, at *2. If the impairment results in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain of functioning, then the impairment is of listing-level severity and therefore functionally equal to a listed impairment. 20 C.F.R. § 416.926a(a). A "marked" limitation is one that is more than moderate but less than extreme, and interferes "seriously" with the ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2)(I). An "extreme" limitation is one that interferes "very seriously" with the ability to independently initiate, sustain, or complete

activities. 20 C.F.R. § 416.926a(e)(3)(I). The six functionality domains to be assessed are: (i) acquiring and using information, (ii) attending and completing tasks, (iii) interacting and relating with others, (iv) moving about and manipulating objects, (v) caring for yourself, and (vi) health and physical well-being. 20 C.F.R. § 416.926a(b)(1).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### DISCUSSION

Plaintiff argues the ALJ erred in finding Plaintiff was less than markedly impaired in the domains of acquiring and using information, interacting and relating with others, and caring for oneself. (Doc. 18, at 10-14). Plaintiff also argues the ALJ failed to comply with the treating physician rule with respect to treating physicians Drs. Witham and Yeh's opinions, and failed to explain the weight he credited state agency physicians. (Doc. 18, at 14-15).

9

While the undersigned is reluctant to disrupt the ALJ's ultimate finding, remand is appropriate for application of the treating physician rule as it pertains to the ALJ's adult RFC finding and childhood domains of functioning.

### Treating Physician Rule

Generally, medical opinions of treating physicians are accorded greater deference than non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairments and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242.

A treating physician's opinion is given "controlling weight" if it is supported by: 1) medically acceptable clinical and laboratory diagnostic techniques; and 2) is not inconsistent with other substantial evidence in the case record. *Id.* (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). When a treating physician's opinion does not meet these criteria, an ALJ must weigh medical opinions in the record based on certain factors. 20 C.F.R. § 404.1527(c)(2). In determining how much weight to afford a particular opinion, an ALJ must consider: (1) examining relationship; (2) treatment relationship – length, frequency, nature and extent; (3) supportability – the extent to which a physician supports his findings with medical signs and laboratory findings; (4) consistency of the opinion with the record as a whole; and (5) specialization. *Rogers*, 486 F.3d at 242; *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010).

Importantly, the ALJ must give "good reasons" for the weight he gives a treating physician's opinion, reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Rogers*, 486 F.3d at 242. An ALJ's reasoning may be brief, *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009), but failure to provide any reasoning requires remand. *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409–10 (6th Cir. 2009).

Good reasons are required even when the conclusion of the ALJ may be justified based on the record as a whole. The reason-giving requirement exists, in part, to let claimants understand the disposition of their cases, particularly in cases where a claimant knows her physician has deemed her disabled and might be bewildered when told by an ALJ she is not, unless some reason for the agency's decision is supplied. *Wilson*, 378 F.3d at 544 (quotations omitted). "The requirement also ensures the ALJ applied the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Id*.

Here, the ALJ summarized Drs. Witham and Yeh's opinions but failed to assign any weight to them, or give good reasons to the extent he discounted them. The ALJ discussed Dr. Yeh's opinion that Plaintiff was unable to attend school but failed to provide any reasoning as to how this opinion factored into his childhood domain functioning or adult RFC analysis. In addition, although the ALJ ostensibly agreed with portions of Dr. Witham's opinion, he failed to assign any weight to his opinion that Plaintiff was unable to attend school without accommodation in the context of his adult RFC.

While the ALJ's decision may be justified on the whole, procedural restraints require remand for the ALJ to proffer reasons that are "sufficiently specific to make clear to any

subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Rogers*, 486 F.3d at 242.

***Child Domains of Functioning***

To the extent Plaintiff argues the ALJ erred in determining his domains of functioning as a child, the Court awaits further development of the treating physician rule on remand to make a conclusive determination on that issue.

CONCLUSION

Following review of the arguments presented, the record, and applicable law, the Court finds the ALJ failed to follow the treating physician rule. Accordingly, this matter is remanded to the Commissioner under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

IT IS SO ORDERED.

_____s/James R. Knepp, II
United States Magistrate Judge
